UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Mark Rehl and Dawn DeRatier, Individually
and as Administrators of the Estate of
Matthew M. Rehl,                                CV-05-3516 (CPS)

                              Plaintiffs,
                                                MEMORANDUM
         - against -                            OPINION AND
                                                ORDER
Lear Romec, a Division of Hydro-Aire, Inc.,
and Master Aviation, Inc.,

                              Defendants.

----------------------------------------X

SIFTON, Senior Judge.


        Plaintiffs Mark Rehl and Dawn DeRatier,[1] individually and as

co-administrators of the estate of decedent Matthew Rehl, filed a

diversity action on December 14, 2004 in the District of

Connecticut against defendants Lear Romec, a Division of Hydro-

Aire, Inc., ("Lear Romec") and Master Aviation, Inc., asserting

wrongful death and survival claims[2] in relation to an airplane

crash near Woodbury, Connecticut in which Matthew Rehl was

killed.  Plaintiffs and decedent Matthew Rehl are New York

domiciliaries.  Hydro-Aire is a California corporation with its

principal place of business in California, and the Lear Romec

_____

        [1] Plaintiffs are decedent Matthew Rehl's parents.

        [2] Specifically, plaintiffs allege claims for relief sounding in
negligence, breach of warranty, and strict liability against Lear Romec and in
negligence and breach of warranty against Master Aviation.  In this motion,
the parties discuss only the measure of damages under applicable law; the
parties have not argued, and I do not decide, whether New York or Connecticut
law applies to issues of liability.

division is based in Ohio.[3]  Master Aviation is a Delaware

corporation with its principal place of business in Connecticut.

On April 14, 2007, Master Aviation filed a Third-Party

Complaint in this action against M.K. Two, Inc., a New York

corporation based in New York, Teledyne Mattituck Services, a

Delaware corporation also based in New York, and Kelly Aerospace,

an Alabama corporation based in Alabama, seeking contribution and

indemnification.

The case was transferred to this Court in July 2005 by the

Judicial Panel for Multidistrict Litigation ("MDL Panel"). *See In

re Air Crash Near Woodbury, Connecticut,* 374 F.Supp.2d 1358

(Jud.Pan.Mult.Lit. 2005).[4]  Now before this Court is plaintiffs'

motion for partial summary judgment, pursuant to Fed. R. Civ.

Pro. 56, seeking to establish that, as a matter of Connecticut

---

[3] Crane Corporation, a Delaware corporation with its principal place of business in Connecticut, is Hydro-Aire's parent company and was originally named as a defendant in this action.  By stipulation in July 2005, Crane Corp. was dismissed from the action upon the substitution of "Lear Romec, a division of Hydro-Aire, Inc." as the proper defendant. *See* Affidavit of Michael Brady, CFO of Hydro-Aire, ¶ 4 (regarding Hydro-Aire's domicile); http://www.craneaerospace.com/about_us/lear_romec.htm (identifying the Ohio address of the Lear Romec division).

[4] The MDL Panel consolidated eight related actions in this Court. The seven other actions were originally commenced in the District of Connecticut, the Eastern District of Pennsylvania, the Middle District of Pennsylvania, and the Eastern District of New York by Norma Knopf, individually and as administrator of the estate of Paul Knopf, who was also killed in the crash. Those actions were dismissed by stipulation in March 2007.  As discussed in more detail below, a related action filed by plaintiffs Mark Rehl and Dawn DeRatier is currently pending on New York State Supreme Court, County of Nassau.

law, their damages are not limited to pecuniary losses.[5]
Defendant Lear Romec has cross-moved for partial summary judgment
to dismiss plaintiffs' claims for such damages on the grounds
that recovery of non-pecuniary damages is barred as a matter of
New York law.[6]  For the reasons discussed herein, plaintiffs'
motion is denied and defendant Lear Romec's motion is granted.

**Background**

The following facts are drawn from plaintiffs' Complaint and
the submissions of the parties in connection with this motion.
Disputes are noted.

*Factual History*

On December 20, 2002, Matthew Rehl was piloting a Piper
Saratoga airplane which departed from Rutland, Vermont and was
bound for Farmingdale, New York.  Paul Knopf, a Vermont

---

[5] Transferee "courts in this district and elsewhere [regularly] decide
choice-of-law and dispositive motions in transferred cases, including aviation
litigation." *In re Air Crash at Belle Harbor, New York on November 12, 2001,*
2006 WL 1288298, at *6 (S.D.N.Y. 2006).

[6] In the New York state court action, defendants have filed motions for
summary judgment based on choice-of-law, arguing that New York wrongful death
and survival law applies under New York choice-of-law rules.  Plaintiffs filed
opposing briefs arguing that Connecticut law applies to their claims.  The
motions were returnable February 20, 2007.  The state court has yet to rule on
these motions, which are distinct from the present motions which require the
application of Connecticut's choice-of-law rules rather than New York's, as
discussed below.

domiciliary, was the only passenger.[7]  During the flight, the
plane crashed near Woodbury, Connecticut and both Rehl and Knopf
were killed.

According to plaintiffs' Complaint, as amplified by their
filings in connection with this motion, the crash was the result
of a defective fuel pump which caused an in-flight fire.[8]  The
plaintiffs state that the aircraft was maintained by Master
Aviation for the six-month period prior to the crash and that the
fuel pump was designed and manufactured by Lear Romec.

According to defendants, the plane was owned by M.K. Two,
Inc., and Farmingdale was the plane's home-base.  The plane was
manufactured by Piper Aircraft Corp. in Vero Beach, Florida and
used an engine manufactured by Lycoming Engines in Pennsylvania.
Master Aviation performed annual inspections of the airplane in
Connecticut and helped identify engine overhaul facilities for
M.K. Two, Inc.  In September 2002, M.K. Two, Inc. selected
Teledyne Mattituck to overhaul the engine.  At the request of
M.K. Two, Inc., Master Aviation removed the engine and sent it to
Teledyne Mattituck in New York; M.K. Two, Inc. paid for the

---

[7] Paul Knopf is presumably a relative of Michael Knopf.  Michael Knopf
is the president of M.K. Two, Inc., the New York corporation which owned the
plane.  Michael Knopf's domicile is not specified in the parties' submissions
on this motion.  He apparently has connections with Vermont where invoices for
services on the plane have been sent. *See* Affidavit of Alan Speakmaster,
President of Master Aviation, ¶ 9; Lear Romec Exhibit I, Invoice from Teledyne
Mattituck.

[8]  These allegations as to the cause of, and events preceding, the
accident are+ undisputed for the purposes of the present motions.

shipping and the overhaul of the engine.[9] Teledyne Mattituck completed the engine overhaul at its facility in New York, which included installing an overhauled fuel pump. The fuel pump was originally manufactured in Ohio by Lear Romec in 1978 and had been overhauled by Kelly Aerospace Power Systems, Inc. in Alabama. After its overhaul, Teledyne Mattituck returned the engine to Master Aviation in Connecticut which then installed the engine in the plane in October, 2002 and completed an annual inspection; this installation involved, among other things, connecting the airplane fuel line to the fuel pump.[10]

*State Court Proceedings*

In addition to the federal action, plaintiffs have filed, as already noted, an action in New York State Supreme Court stating claims against the defendants and third-party defendants in this case as well as against two additional parties. The additional state defendants are: (1) Lycoming Engines,[11] which manufactured the engine in Pennsylvania; and (2) Piper Aircraft (a Delaware corporation with its principal place of business in Florida),

---

[9] *See* Speakmaster Affidavit, ¶¶ 5-7; Lear Romec Exhibit I, Invoice from Teledyne Mattituck.

[10] The relationship between these additional companies and the events leading to the crash is set forth in plaintiffs' verified state court complaint, attached to Lear Romec's motion as Exhibit M, where each of these companies is named as a defendant.

[11] Lycoming is an operating unit of a division of Avco Corp., a Delaware corporation with its principal place of business in Rhode Island.

which manufactured the plane in Florida.

*Federal Court Proceedings*

On February 16, 2007, plaintiffs filed the present motion for partial summary judgment,[12] arguing that Connecticut wrongful death law, which permits recover for non-pecuniary damages, should apply.[13]  Lear Romec cross-moved on March 19, 2007, arguing that New York wrongful death law should apply and, accordingly, that claims for non-pecuniary losses should be dismissed as a matter of law.[14]

---

[12] Plaintiffs originally filed a "motion for determination of applicable law." At oral argument on March 29, 2007, plaintiffs agreed that the motion was appropriately designated as a motion for partial summary judgment.

[13] Conn. Gen. Stat. § 52-555(a) states that an executor or administrator may bring an action for "for injuries resulting in death" and "recover from the party legally at fault . . . just damages . . . ."  Courts in Connecticut have interpreted "just damages" to include:

> (1) the value of the decedent's lost earning capacity less deductions for her necessary living expenses and taking into consideration that a present cash payment will be made, (2) compensation for the destruction of her capacity to carry on and enjoy life's activities in a way she would have done had she lived, and (3) compensation for conscious pain and suffering.

*Sanderson v. Steve Snyder Enterprises, Inc.,* 491 A.2d 389, 397 n.12 (Conn. 1985).

[14] Under New York law, a decedent's survivors are entitled to "fair and just compensation for the *pecuniary* injuries resulting from the decedent's death to the persons for whose benefit the action is brought." NY EPTL § 5-4.3 (emphasis added); *see Morgan Guar. Trust Co. of New York v. Garrett Corp.,* 625 F.Supp. 752, 760-61 (S.D.N.Y. 1986) ("New York courts have strictly construed the wrongful death statute . . . to allow recovery only for pecuniary loss.").

# Discussion

*Summary Judgment Standard*

A court must grant a motion for summary judgment if the movant shows that "there is no genuine issue as to any material fact" and that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c). Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

*Applicable Choice-of-Law Rule*

As the parties agree, in a case which has been transferred by the MDL Panel from one federal court to another, the transferee court must apply the choice-of-law rule that would apply in the transferor court. *See In re Parmalat Securities Litigation,* 2007 WL 869012, at *3 (S.D.N.Y. 2007) ("To the extent that the action involves issues of state law, this Court applies the choice of law rules that would govern in the transferor forum."). Since this case is based upon diversity jurisdiction, the transferor court would be required to apply the choice-of-law rule of the forum state, which in this case is Connecticut. *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002). Accordingly, Connecticut choice-of-law rules will be

applied in the choice-of-law analysis.


*Connecticut Choice-of-Law Doctrine*

Connecticut traditionally applied the doctrine of *lex loci delicti* (the law of the place of injury) in determining the applicable law in tort actions. *See O'Connor v. O'Connor*, 519 A.2d 13, 15 (Conn. 1986)); *see also Rosenthal v. Ford Motor Co., Inc.,* 462 F.Supp.2d 296, 301 (D.Conn. 2006). However, in *O'Connor*, the Supreme Court of Connecticut retreated from this "categorical" approach and stated that where "application of the doctrine of *lex loci* would produce an arbitrary, irrational result," it is more appropriate to apply the 'most significant relationship' analysis of §§ 6 and 145 of the Restatement (Second) of Conflict of Laws (1971). 519 A.2d at 21-22;[15] *see also Rosenthal,* 462 F.Supp.2d at 301. While courts in Connecticut initially took divergent views as to the significance of the *O'Connor* decision, the clear trend in both state and federal courts has recently been to apply the Restatement guidelines in nearly all cases. *Rosenthal,* 462 F.Supp.2d at 301 ("This court will follow the trend" and apply the Restatement analysis) (internal quotations omitted); *U.S. Fidelity & Guaranty*

---

[15] As the *O'Connor* court noted, "[t]he *lex loci* approach fails to acknowledge that jurisdictions other than the place of injury may have a legitimate interest in applying their laws to resolve particular issues arising out of a tort controversy." 519 A.2d at 18.

*Co. v. S.B. Phillips Co., Inc.*, 359 F.Supp.2d 189, 206 (D.Conn. 2005) (""Recently, courts applying Connecticut choice-of-law law have used the Restatement approach even where *lex loci* would lead to the same result." ); *Schuster v. Dragone Classic Motor Cars, Inc.*, 67 F.Supp.2d 288 (S.D.N.Y. 1999) (citing cases); *Campofiore v. Wyeth*, 2004 WL 3105962, at *2 (Conn.Super.Ct. 2004) ("In light of this clear trend toward a full embrace of the conflict of laws principles established by the Restatement, it is appropriate to utilize those principles in deciding the choice of law issue presented here."); *Gatti v. Forcier*, 2003 WL 22133184, at *2 (Conn.Super.Ct. 2003) ("The court concludes that in adopting *O'Connor*, the Connecticut Supreme Court intended to overrule the strict application of the *lex loci* rule both to injury and to wrongful death cases.").[16]   Accordingly, I apply the Restatement standards in determining whether Connecticut or New York law should apply in this case.

---

[16] A review of tort cases in Connecticut courts from the past five years reveals that even those cases which refer to the *lex loci* standard ultimately rely on the "most significant relationship" test. *But see Norton v. Michonski*, 368 F.Supp.2d 175, 178-79 (D.Conn. 2005) (Where an injury was sustained in Massachusetts but action was filed in Connecticut and neither party raised a choice-of-law question, court determined that application of Massachusetts law under *lex loci* would not be "arbitrary" since Massachusetts was the site of the accident and location where injuries were sustained and defendants were Massachusetts residents); *Pouliot v. Paul Arpin Van Lines, Inc.*, 367 F.Supp.2d 267, 272 (D.Conn. 2005).

*Restatement Choice-of-Law Standards*[17]

The Restatement (Second) of Conflict of Laws specifically refers to wrongful death claims in § 178, which states that "[t]he law selected by application of the rule of § 175 determines the measure of damages in an action for wrongful death." Section 175 in turn states that:

> In an action for wrongful death, the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6[18] to the occurrence and the parties, in which event

---

[17] Plaintiffs briefly refer to the fact that they also seek punitive damages. To the extent that plaintiffs may be arguing that there is a conflict-of-laws issue with regards to punitive damages which must be resolved (in addition to the primary issue relating to the applicable wrongful death statute), there is no apparent conflict between New York and Connecticut law on the issue, nor have the parties given any indication that such a conflict exists. *See Guariglia v. Price Chopper Operating Co., Inc.,* 830 N.Y.S.2d 871, 872 (N.Y. App. Div. 3 Dept. 2007) (In New York, "[p]unitive damages may be awarded where a defendant's conduct, even though unintentional, is grossly negligent, or wanton or so reckless as to amount to a conscious disregard of the rights of others.") (internal quotations and citations omitted); NY EPTL § 5-4.3(b) ("Punitive damages may be awarded [in a wrongful death claim] if such damages would have been recoverable had the decedent survived."); *Venturi v. Savitt, Inc.,* 468 A.2d 933, 935 (Conn. 1983) (In Connecticut, "[i]n order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights."); *Gionfriddo v. Avis Rent A Car Sys.,* 472 A.2d 306 (Conn. 1984) ("We therefore conclude that the proper interpretation of our wrongful death statute permits recovery, as 'just damages,' of [punitive] damages which the decedent might have recovered had she survived."). Where there is no conflict, "there is no need to perform a choice of law analysis, and the law common to the jurisdictions should be applied." *Lumbermens Mut. Cas. Co. v. Dillon Co., Inc.,* 2001 WL 585736, at * 1 (2d Cir. 2001) ("The threshold choice of law question in Connecticut, as it is elsewhere, is whether there is an outcome determinative conflict between the applicable laws of the states with a potential interest in the case.").

[18] Section 6 provides that:

the factors relevant to the choice of the applicable rule of law include: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the

the local law of the other state will be applied.

Restat.2d, § 175; *see Vecchio v. Rye Brook Obstetrics -Gynecology, P.C.,* 2003 WL 22482046, at *4 (Conn.Super.Ct. 2003) ("Section 175 establishes a presumption that the law of the state where the injury occurred governs, unless another state has a more significant relationship consistent with § 6 of the Restatement.").

To determine whether another state has a more "significant relationship," courts first apply the factors set forth in § 145 of the Restatement. *Williams v. State Farm Mut. Auto. Ins. Co.,* 641 A.2d 783, 789 (Conn. 1994); *Partman v. Budget Rent-A-Car,* 1996 WL 62689, at *2 (Conn.Super.Ct. 1996). According to § 145 of the Restatement "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." Restat.2d, § 145(1). The Restatement continues:

> Contacts to be taken into account in applying the
> principles of § 6 to determine the law applicable to an
> issue include:
> (a) the place where the injury occurred,

---

protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restat.2d, § 6.

    (b) the place where the conduct causing the injury
    occurred,
    (c) the domicil, residence, nationality, place of
    incorporation and place of business of the parties, and
    (d) the place where the relationship, if any, between
    the parties is centered.
    These contacts are to be evaluated according to their
    relative importance with respect to the particular
    issue.

Restat.2d, § 145(2).  Accordingly, I review first the contacts

and their relevant importance to the issue of pecuniary versus

non-pecuniary damages.


<u>Section 145(2) Contacts</u>

Factor (a): Place of Injury

    There is no dispute that the injury occurred in Connecticut.

However, "in a disaster befalling a plane aloft, the place of the

crash is often random . . . and the sovereignty in which the

accident occurs has little interest in applying its substantive

law to the case." *Pescatore v. Pan American World Airways, Inc.,*

97 F.3d 1, 13 (2d Cir. 1996) (citing cases); *see also Saloomey v.*

*Jeppesen & Co.,* 707 F.2d 671, 675 (2d Cir. 1983) ("The

happenstance of an aviation accident in West Virginia as a result

of appellant's map-making in Colorado should not alter the normal

expectations of the parties."); Restat.2d, § 145(2) cmt. e

("Situations do arise, however, where the place of injury will

not play an important role in the selection of the state of the

applicable law.  This will be so, for example, when the place of

injury can be said to be fortuitous or when for other reasons it bears little relation to the occurrence and the parties with respect to the particular issue."). Since the airplane crashed in Connecticut, while traveling between Vermont and New York, the location of the injury is in large part fortuitous and is not itself entitled to much weight in this analysis.

Factor (b): Place where Conduct Causing Injury Occurred

According to plaintiffs' brief on this motion, Connecticut has the most significant contacts since Master Aviation maintained the aircraft in Connecticut and, moreover, Connecticut "acted as the host, through Master Aviation, to the negligence of additional defendants over whom this Court lacks jurisdiction" who are defendants in plaintiffs' state court action. However, it is not at all clear that the phrase "Connecticut acted as the host, through Master Aviation" has any meaning either legally or factually. Moreover, the allegedly tortious action of Lear Romec, which originally designed and built the fuel pump, occurred in Ohio.[19] Further, as plaintiffs themselves allege in

---

[19] *See* Affidavit of Douglas Wright, Field Service Engineer for Lear Romec, ¶ 4 (confirming that a review of the fuel pump's service records indicates that it was originally manufactured in Ohio in 1978). There is nothing indicating, nor do plaintiffs allege, that Lear Romec had any direct involvement with the fuel pump after it left Ohio.

their verified state court Complaint,[20] several other parties

whose negligence is alleged by plaintiff to have caused the fuel

pump to fail have no connection with Connecticut.  The plane was

built by Piper in Florida; the engine was built in Pennsylvania

by Lycoming; the fuel pump was overhauled in Alabama by Kelly

Aerospace; and the engine was overhauled and an overhauled fuel

pump installed by Teledyne Mattituck in New York.  Although

Master Aviation assisted in identifying maintenance facilities,

it was M.K. Two, Inc., a New York corporation, which selected and

contracted with Teledyne Mattituck for the engine overhaul and

instructed Master Aviation to remove and send the engine to

Teledyne Mattituck in New York and to later reinstall the

overhauled engine into the plane.[21] Speakmaster Affidavit, ¶¶ 5-

7.  Connecticut was simply the most recent of several states,

including New York, in which allegedly negligent activities

occurred.  New York has at least as many contacts with the

conduct allegedly causing the injury as Connecticut.

Accordingly, this factor does little to inform the analysis.


Factor (c): Location of the Parties

        There is no dispute that Master Aviation is a Delaware

---

[20] In the current motion, plaintiffs also refer to these other parties as defendants who are not parties to the federal action due to a lack of jurisdiction.

[21] Neither party indicates who contacted Kelly Aerospace to acquire the overhauled fuel pump.

corporation with its principal place of business in Connecticut.
Plaintiffs persist in arguing, despite the stipulation dismissing
Crane Corp. from this action, that the Lear Romec division which
manufactured the fuel pump is also a Connecticut domiciliary due
to the fact that Crane Corp., the parent company of Hydro-Aire,
has its principal place of business in Connecticut.[22]  However,
as stipulated by the parties in dismissing Crane Corp. from this
action, Lear Romec is a division of Hydro-Aire, Inc., a
California corporation, and the Lear Romec division itself is
located in Ohio.  Plaintiffs have provided no evidence that
Hydro-Aire or its Lear Romec division have any direct contacts to
Connecticut other than their relationship as subsidiaries of
Crane Corp.[23]  Since "American law generally presumes that
corporations are entities separate from their subsidiaries," and
plaintiffs have offered no evidence that Hydro-Aire or the Lear
Romec division are functioning as the 'alter-ego' of Crane Corp.,
the fact that Crane Corp. is domiciled in Connecticut is of no
relevance. *In re Air Disaster Near Cove Neck, N.Y., on Jan. 25,
1990,* 774 F.Supp. 718, 720 (E.D.N.Y. 1991) (citing Fletcher Cyc.

---

[22] *See* Plaintiff's Statement of Undisputed Facts, ¶ 8 ("Defendant Lear
Romec, as a Division of Crane Co., manufactures fuel pumps in Ohio and has as
its parent company, defendant Crane Co., a Delaware Corporation with its
principal place of business in Stamford, Connecticut.").

[23] Though the Complaint states that plaintiffs believe that Lear Romec
conducted "substantial business" in Connecticut, they have provided no support
for that allegation in the present papers. First Amended Complaint, ¶ 4.
Plaintiffs have not responded to defendants' statement that Lear Romec is not
a Connecticut domiciliary.

Corp. § 43 (1989) ("As a general rule, two separate corporations are regarded as distinct legal entities even if the stock of one is owned wholly or partly by the other.")).  In addition, it is undisputed that plaintiffs and the decedent are domiciliaries of New York.  "When the parties are not 'grouped in a single state,' the fact that 'one of the parties is domiciled or does business in a given state will usually carry little weight of itself.'" *Rosenthal,* 462 F.Supp.2d at 302 (quoting Restat.2d, § 145 cmt. e).  Since there are an equal number of parties in the federal action from New York as from Connecticut, this factor does not aid in the analysis.

Factor (d): Center of Relationship

Prior to this litigation, there was no relationship between Lear Romec, which built the fuel pump in 1978, Master Aviation, which inspected the aircraft and installed the overhauled engine, and plaintiffs or decedent.  To the extent that there is any nexus in the relationship between the parties, it is with New York.  Although M.K. Two, Inc. is not a party to the action brought in federal court by plaintiffs,[24] it owned the plane and contracted with New York and Connecticut companies for the maintenance work, performed in New York and Connecticut, which

---

[24] While M.K. Two, Inc. is a party to Master Aviation's third-party complaint, it cannot be made a party to plaintiffs' action without undermining diversity.

allegedly contributed to the crash.[25]  In addition, the plane was
based in New York, and was being flown back to New York by
decedent, who himself was New York domiciliary.  Thus, the events
leading the crash were centered in New York. *See Otis Elevator
Co. v. Factory Mut. Ins. Co.,* 353 F.Supp.2d 274, 286 (D.Conn.
2005) (where there was no direct prior relationship between the
parties, court looked at the totality of circumstances to
determine where the relationship was centered).

In sum, although the first factor weighs slightly in favor
of applying Connecticut law due to the happenstance of the
location of the crash, the fact that New York served as the nexus
of the relationship between the decedent, the allegedly negligent
entities, the plane itself, and the trip which resulted in
Matthew Rehl's death weighs more significantly in favor of
finding that New York is the state with the most significant
contacts under § 145(2).

Section 6 Factors[26]

"[T]he Court must also analyze the respective policies and
interests" of New York against the policies and interests of
Connecticut by evaluating the § 6 factors. *Griffith v. White,* 929

---

[25] *See* Speakmaster Affidavit.

[26] Some courts end their analysis with the § 145(2) factors.  However,
analysis of the § 6 factors is appropriate under § 145(1).

F.Supp. 755, 759 (D.Vt. 1996). However, "[n]ot all of the § 6 factors will be equally important in every case. Indeed, comment b to § 145(1) states that the choices of policy emphasized in § 6(d), (e), and (f) are "of lesser importance in the field of torts." Restat.2d, § 145 cmt. b; *see also Rosenthal*, 462 F.Supp.2d at 303. Given the "relative insignificance" of the factors listed in (d), (e), and (f), the "four remaining factors that are listed in § 6 "assume greater importance." *Id.*[27]

---

[27] To the extent that these factors should be considered at all, they do not favor the application of either state's law. Regarding factor (d), Justified Expectations, the Restatement says that:

> Generally speaking, it would be unfair and improper to hold a person liable under the local law of one state when he had justifiably molded his conduct to conform to the requirements of another state . . . . [However] [t]here are occasions, particularly in the area of negligence, when the parties act without giving thought to the legal consequences of their conduct or to the law that may be applied. In such situations, the parties have no justified expectations to protect, and this factor can play no part in the decision of a choice-of-law question.

Restat.2d, § 6(a) cmt. g. In this case, to the extent that the justified expectations of the parties are a factor, defendant Lear Romec, which manufactured the fuel pump in Ohio, is as likely to have expected a suit in New York as in Connecticut. Master Aviation, although a Connecticut corporation, should also have expected the possibility of a suit in New York, as it was aware that the plane it worked on was based in New York and was owned by a New York corporation. Accordingly, this factor does not favor the application of either state's law.

With regards to factor (e), Basic Policies, the Restatement says:

> This factor is of particular importance in situations where the policies of the interested states are largely the same but where there are nevertheless minor differences between their relevant local law rules. In such instances, there is good reason for the court to apply the local law of that state which will best achieve the basic policy, or policies, underlying the particular field of law involved.

Restat.2d, § 6(a) cmt. h. Here, each state has its own distinct and equally valid view regarding the appropriate limitation on liability in wrongful death cases, which is reflected in their respective wrongful death statutes. It cannot be said that the application of one state's law rather than the other's will better assist in achieving the basic policy underlying the field of law, namely allocating losses and compensating survivors.

Factor (a): Needs of Interstate and International System

This factor "seeks to harmonize relations between states and 'to facilitate commercial intercourse between them.'" *Rosenthal,* 462 F.Supp.2d at 303 (quoting Restat.2d Conflicts, § 6(a) cmt. d). In this case, there is no apparent systemic benefit to applying Connecticut law, particularly where the significant contacts are centered in New York and where the primary factor in favor of applying Connecticut's law is the fortuitous crash in that state,[28] nor would application of New York law appear to have any impact on the interstate system either. Therefore, this factor is not particularly informative. *See Rosenthal*, 462 F.Supp.2d at 304 ("[T]his factor does not offer much guidance [where] it is doubtful that [the] court's choice of law decision will have any bearing on this goal.") (internal quotations and citations omitted).

Factors (b)&(c): Policies of Connecticut and New York

---

As for factor (f), Certainty, Predictability & Uniformity, this factor is "of particular importance in areas where the parties are likely to give advance thought to the legal consequences of their transactions" and, as a result, parties are generally allowed to do such things as include choice-of-law clauses in their contracts. Restat.2d, § 6(a) cmt. I. Here, there is no indication that the parties gave any advance thought to the legal consequences of their interactions and I can see no benefit for certainty or uniformity which will be accomplished through the decision on choice-of-law.

[28] Though, however unlikely, one could foresee some disruption if Connecticut law was applied, as New York based airlines may consider changing their routes to avoid Connecticut or insurers may raise rates for insuring carriers which fly those routes in fear that simply crashing in Connecticut would be sufficient to generate application of Connecticut's wrongful death law.

The issue here involves that the applicability of the very different policies underlying wrongful death statutes of New York and Connecticut. Quoting from *Reich v. Purcell*, 432 P.2d 727, 730-31 (Cal. 1967), the *O'Connor* court noted that statutory limitations on wrongful death damages "have little or nothing to do with [regulating] conduct. They are concerned not with how people should behave but with how survivors should be compensated. [Therefore] [t]he state of the place of the wrong has little or no interest in such compensation when none of the parties reside there." *See O'Connor*, 519 A.2d at 24; *see also Cooney v. Osgood Mach., Inc*., 612 N.E.2d 277, 280-81 (N.Y. 1993).

While "Connecticut obviously has a strong interest in compensating survivors in a wrongful death action for their pecuniary losses, since failure to provide adequate compensation could mean that the plaintiffs would become burdens of the state," the survivor plaintiffs in this case are not Connecticut domiciliaries and are at no risk of becoming wards of the state in Connecticut, and, therefore, Connecticut's interest in ensuring that they recover fully for their loss is limited. *Halstead v. U.S.,* 535 F.Supp. 782, 788 (D.Conn. 1982); *see also Saloomey*, 707 F.2d at 675 ("Connecticut, through its legislature and courts, has indicated strong interest in fully compensating its domiciliaries when they file meritorious wrongful death . . . actions."); *Morgan Guar. Trust Co. of New York v. Garrett Corp.,*

625 F.Supp. 752, 761 (S.D.N.Y. 1986) ("Connecticut's interest in these disputes is in promoting the financial welfare of its domiciliaries.").[29]

In contrast, the survivor plaintiffs are domiciliaries of New York, which has "a strong public policy to specifically limit recovery in wrongful death actions to pecuniary damages resulting from decedent's death." *O'Rourke v. Eastern Air Lines, Inc.*, 730 F.2d 842, 850 (2d Cir. 1984) (abrogated on other grounds by *Salve Regina College v. Russell*, 499 U.S. 225 (1991)) (internal citations and quotations omitted).  In the circumstances presented by this case, Master Aviation, as noted above, has already filed a Third-Party Complaint in this action against New York corporations M.K. Two, Inc. and Teledyne Mattituck, alleging that any negligence is attributable to them, and it is likely that Lear Romec, should it be found liable, will also seek contribution from these New York corporations for their alleged negligence.  New York, "in order to discourage forum shopping and encourage business within the state, has a governmental interest in assuring that defendants will not be subject to damage awards

---

[29] Though plaintiffs contend that Connecticut has an interest in ensuring that "justice" is done to non-residents injured by wrongdoing committed in the state, they offer no support for their argument that such an interest lies behind the wrongful death statute.  Moreover, to the extent that it is an aspect of Connecticut's interest, New York's wrongful death statute equally provides for "justice," though it limits damages differently.

larger than those provided for by state law." *Id.*;[30] *see also*
*Halstead,* 535 F.Supp. at 789 (Every state "has a substantial
interest in the economic health of corporations which do business
within its borders.  It derives substantial sales and income
taxes, as well as other revenues, directly and indirectly from a
corporation's activities within the state . . . . [The] rule
limiting liability to the pecuniary losses of the survivors in a
wrongful death action enhances the financial well-being of its
corporations, which in turn enhances the financial well-being of
the state.") (internal citations and quotations omitted).
Accordingly, New York has the more significant interest than
Connecticut in applying its public policy in this case.[31]


(g) Ease of Determination

There are no constraints in determining or applying either
New York or Connecticut wrongful death law.  The laws of both

---

[30] Plaintiffs have not stated any reason why Connecticut's public policy
interests would be served by applying its law to Master Aviation and/or Lear
Romec and subjecting them to higher levels of damages.

[31] Plaintiffs refer to Connecticut's interest in promoting airline
safety and ensuring that planes do not fall out of the sky onto property in
the state. *See Bemer Aviation, Inc. v. Hughes Helicopter, Inc.,* 621 F.Supp.
290, 298 (D.C.Pa. 1985) (discussing product liability laws).  While the state
of Connecticut undoubtedly has such an interest, the wrongful death statute at
issue here was not designed to promote that interest.  As discussed, the
statute involves a legislative judgments on how to best allocate losses and
ensure that victims are adequately compensated.  It does not involve the
state's interest in promoting safety and plaintiffs offer no support for the
proposition that the damages allowed under § 52-555 were designed to deter
misconduct or punish tortfeasors (in contrast to product liability laws and
laws with respect to punitive damages).

states have been applied many times by state and federal courts and will not pose any undue challenge in this case.

Accordingly, in the circumstances of this case, New York is the state with the most significant contacts and the state whose public policy interests are most at stake.  Accordingly, New York state wrongful death law will apply.

*Application of New York Law*

Under New York's wrongful death statute, damages are limited to pecuniary losses alone.  *See* NY EPTL §§ 5-4.3.  All claims for non-pecuniary losses are accordingly dismissed.[32]

---

[32] Lear Romec also argues that since New York law allows recovery of damages in a wrongful death suit exclusively by decedent's distributees (in this case, his parents), all claims for recovery by persons or entities other than decedent's parents are barred as a matter of law and should be dismissed. *See* N.Y. Est. Powers & Trusts Law § 5-4.4 ("NY EPTL").  Since neither party has identified the Connecticut law on the subject, established how, if at all, the laws conflict or what the respective interests of the two states are in applying their law on this issue, I make no determinations on this issue.

## Conclusion

For the reasons set forth above, plaintiffs' motion for partial summary judgment is denied and defendant Lear Romec's motion for partial summary judgment is granted.  The Clerk is directed to transmit a copy of the within to the parties and to the Magistrate Judge.


SO ORDERED.


Dated :   Brooklyn, New York
          April 26, 2007


                    By: <u>/s/ Charles P. Sifton (electronically signed)</u>
                           United States District Judge